## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2183 | **DATE** | 12/16/2003 |
| **CASE TITLE** | Congress Financial Corp. vs. Tad Ballantyne, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: We find that Ballantyne and Renzoni have not alleged direct injury sufficient to satisfy Federal Rule of Civil Procedure 17(a)'s real party in interest requirement. Congress' motion to dismiss (17-1) and motion to strike (17-2) is granted. Ballantyne and Renzoni are granted leave to amend only to the extent that they can allege direct harm inflicted upon them by Congress in relation to their guarantees.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 17 2003 | |
| | Notified counsel by telephone. | | date docketed | 23 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docket deputy initials | |
| | Copy to judge/magistrate judge. | | 12/16/2003 | |
| GL | courtroom deputy's initials | 03 DEC 16 AM 9:17 | date mailed notice GL | |
| | | FILED 03-2183 Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
DEC 17 2003

CONGRESS FINANCIAL CORPORATION )
(CENTRAL), )
 )
      Plaintiff and Counter-Defendant, )
 )
v. ) Case No. 03 C 2183
 )
TAD BALLANTYNE and JEFF RENZONI, )
 )
 )
      Defendants and Counter-Plaintiffs. )

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Congress Financial Corporation (hereinafter "Congress"), filed a complaint against Tad Ballantyne and Jeff Renzoni requesting enforcement of financial guarantees made by Ballantyne and Renzoni in conjunction with a loan agreement. Ballantyne and Renzoni allege that they are under no obligation to satisfy the guarantees and thus filed an answer which contained several affirmative defenses as well as a counterclaim against Congress. Congress responded with the present motion to dismiss the counterclaim and to strike Ballantyne and Renzoni's affirmative defenses. For the reasons set forth below, we grant Congress' motion in its entirety.[1]

---

[1] This court has original jurisdiction over the action brought by Congress under 28 U.S.C. § 1332 (a)(2) because the amount in controversy exceeds $75,000, Congress, the plaintiff, is an Illinois corporation, and Ballantyne and Renzoni are citizens of Wisconsin. Because this court has jurisdiction over the original matter, the court also has supplemental jurisdiction over Ballantyne and Renzoni's counterclaim pursuant to 28 U.S.C. § 1367(a). The parties do not contest that Illinois law applies to each of the claims brought in the complaint as well as those in the counterclaim.

1

23

## BACKGROUND

For the purpose of a motion to dismiss, we accept all well-pled allegations as true. *MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967, 972 (7th Cir. 1995). We therefore recite the facts as Ballantyne and Renzoni present them in their Answer, Affirmative Defenses, and Counterclaim.

In August 2001, Congress entered into a Loan and Security Agreement with Texas Steel Partners, Inc., (hereinafter "Texas Steel"). (Counterpls' Answer and Countercl. ¶ 6.) Ballantyne and Renzoni are the sole shareholders of Texas Steel. (Counterpls' Answer and Countercl. ¶ 15.) At the time of the Texas Steel loan, Ballantyne and Renzoni executed personal guarantees on the loan in the amount of $500,000 each. (Compl. Attach. A, B.)

At around the same time, Congress also entered into a lending agreement with a company called BR Holdings, an affiliate of Texas Steel. BR Holdings subsequently began the process of liquidating its assets. (Counterpls' Answer and Countercl. ¶ 19, Attach. B.)

Congress notified Texas Steel in September of 2002 that certain events of default existed with respect to the Texas Steel loans. To avoid further default, Congress required the company to incorporate into its preexisting loan the $2.3 million BR Holdings debt. Congress also insisted that the agreement providing for the consolidation of the BR Holdings debt and the Texas Steel debt be backdated to September 1, 2002, even though the agreement was actually executed on September 18, 2002. (Counterpls' Answer and Countercl. ¶¶ 23-24.) The reason that Congress insisted upon the transfer of the BR Holdings debt was that the Texas Steel loans were secured by a first lien on Texas Steel's receivables, inventory, machinery, and equipment, and a second lien on real estate. (Counterpls' Answer and Countercl. ¶ 26.) By transferring the debt to Texas Steel, Congress thus attained additional security for its loans to BR Holdings.

In addition, Congress demanded that Texas Steel employ a "turn-around" person to help the company through its financial difficulties. Because Congress insisted that failure to hire a "turn around" person would result in a default on its loans, Texas Steel hired Lance Wimmer to assess its business. Wimmer was paid and controlled by Congress. Shortly after Wimmer was hired, Congress and Wimmer began "exerting dominion and control over the business of Texas Steel." (Counterpls' Answer and Countercl. ¶¶ 27-30.)

Congress, through Wimmer, insisted that Texas Steel file for Chapter 11 Bankruptcy. (Counterpls' Answer and Countercl. ¶ 9). They told Ballantyne and Renzoni that, if Texas Steel filed for bankruptcy, Congress would provide work-out financing in exchange for a first priority lien on all assets ahead of all other Texas Steel creditors. (Counterpls' Answer and Countercl. ¶ 31). Ballantyne and Renzoni were initially opposed to this plan and wished to propose a voluntary plan outside of bankruptcy to their creditors that would allow them to remain a going concern. Congress and Wimmer assured them, however, that filing for Chapter 11 protection would help them out of their financial difficulties, and Ballantyne and Renzoni finally conceded to the plan. (Counterpls' Answer and Countercl. ¶ 32-34). Once they had conceded, Ballantyne and Renzoni were immediately ready to file for Chapter 11 bankruptcy protection, but Congress and Wimmer both insisted that the filing be delayed until December 2, 2002. (Counterpls' Answer and Countercl. ¶ 35.) The effect of this delay, combined with Congress' insistence on back-dating the transfer of BR Holdings' debt to September 1, 2002, was to ensure that the transfer of the BR Holdings loan to Texas Steel could not be voided under 11 U.S.C. § 547(b), a statute which allows a trustee to void a transfer of interest in the debtor's property made "on or within 90 days before the date of the filing of the petition." (Counterpls' Answer and Countercl. ¶ 37.) In other words, Congress structured the timing of the bankruptcy filing so that the transfer of loans for BR Holdings to Texas Steel could not later be undone.

The bankruptcy court rejected Texas Steel's proposal that Congress be given a first priority lien on all of Texas Steel's assets. Thus, Congress refused to provide work-out financing as previously agreed and insisted that Texas Steel's bankruptcy petition be converted into a Chapter 7 liquidation. (Counterpls' Answer and Countercl. ¶ 40.) After liquidation began, Congress sent demand letters to Ballantyne and Renzoni requesting payment on their guarantees of the Texas Steel loans. Ultimately, Congress filed suit to enforce the guarantees. Ballantyne and Renzoni admit that they have made no payments on the guarantees, but deny that they are under any obligation to do so. (Counterpls' Answer and Countercl. ¶ 13.) Instead Ballantyne and Renzoni assert five affirmative defenses to Congress' suit and have filed a three-count counterclaim against Congress. Specifically, they assert the affirmative defenses of: 1) equitable estoppel against Congress' court action; 2) equitable estoppel against the transfer of the BR Holdings debt or the application of the guarantee to that debt; 3) ripeness; 4) waiver; and 5) unclean hands. In their counterclaim, they charge Congress with fraud, equitable estoppel, and breach of fiduciary duty. Congress filed the present motion to dismiss the counterclaims and to strike all of Ballantyne and Renzoni's affirmative defenses.

## ANALYSIS

We are presented with a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990) (quoting *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989)). In considering a motion to dismiss, we must accept all well-pled allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See id.* at 1520-21; *MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967, 972 (7th Cir. 1995), *aff'd* 161 F.3d 443 (7th Cir. 1998), *cert. denied*, 528 U.S. 810 (1999). Therefore, a complaint should not be dismissed "unless it appears beyond all doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

A complaint is required to provide only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(e)(2), unless the pleading avers fraud or mistake. In the case of fraud or mistake, the complaint must state the circumstances constituting the fraud or mistake with particularity. Fed R. Civ. P. 9(b).

Pursuant to Federal Rule of Civil Procedure 12(f), a court "may order stricken from any pleading any insufficient defense." A motion to strike affirmative defenses is generally "not favored" by the courts; however, in some cases it is a "'useful and appropriate tool' for weighing the legal implications to be drawn from uncontroverted facts." *United States v. 416.81 Acres of Land*, 514 F.2d 627, 631 (7th Cir. 1975) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1381 (1969)). Because affirmative defenses are pleadings, they are evaluated according to the same standards as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Renalds v. S.R.G. Restaurant Group, L.L.C.*, 119 F. Supp.2d 800, 802 (N.D. Ill. 2000) (citations omitted).

Congress' main argument is that Ballantyne and Renzoni, as guarantors, do not have standing to raise either their affirmative defenses or their counterclaims. We agree, but on the ground that Ballantyne and Renzoni are not the real parties in interest with regard to the claims that they make, and not on the ground that they lack standing to sue.[2] Federal Rule of Civil Procedure 17(a) states that

---

[2]There is some confusion regarding the difference between the issues of standing and real party in interest. *See, e.g., Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 160 (7th Cir. 1996) (noting that the lower court erred in dismissing the case for lack of standing where it should have dismissed because the plaintiff was not the real party in interest); *see also Hammes v. Brumley*, 659 N.E.2d 1021, 1029-30 (Ind. 1995) (discussing the difference between real party in interest analysis and standing). Here, Ballantyne and Renzoni have standing because they have alleged an injury in fact: they will suffer harm to the tune of $500,000 each if they have to deliver on their guarantees.

5

"[e]very action shall be prosecuted in the name of the real party in interest." Pursuant to this rule, Illinois law requires "that an action for harm to [a] corporation must be brought in the corporate name" and not by one who suffers only derivative injury from the harm inflicted upon the corporation. *Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 160 (7th Cir. 1996). Rather, a person only may sue to recover *direct* injury, or "injury independent of the firm's fate." *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago.*, 877 F.2d 1333, 1336-37 (7th Cir. 1989).[3]

The question presented in this case, then, is whether Ballantyne and Renzoni have sufficiently alleged any direct harm (inflicted by Congress upon them) in any of their counterclaims or affirmative defenses. The crux of all of Ballantyne and Renzoni's claims and defenses is that Congress triggered payment on their guarantees by engaging in several allegedly improper actions that ultimately forced Texas Steel into Chapter 7 liquidation. Ballantyne and Renzoni argue that they should be allowed to recover because, although it was Texas Steel that was forced into bankruptcy, Ballantyne and Renzoni suffered a direct harm when they were forced to make good on their guarantees to Congress. Although

---

*Frank*, 83 F.3d at 160. More properly, the question presented is whether Ballantyne and Renzoni may bring suit to redress their alleged injury, or whether Texas Steel is the only party who can bring such a claim. This is a question of who is the real party in interest and does not involve a question of standing. Because many courts have failed to distinguish between the two admittedly similar concepts, however, many of the cases discussed in this opinion refer just to standing. *See Frank*, 83 F.3d at 159-60 (noting that the outcome of a case was not affected where the district court applied standing analysis rather than real party in interest analysis).

[3]The rationale for the rule that a party may not sue derivatively for harm done to a company was made clear by the Seventh Circuit in the *Mid-State Fertilizer* case. 877 F.2d at 1336-37. There, in finding that the harm to a guarantor was derivative rather than direct, the court warned that allowing a guarantor to bring an action on his own to recover harm done to a corporation could result in what it termed "double counting." *Id.* at 1335. The court presented the example of a case in which a company is harmed in the total amount of $100. If, in such a case, a guarantor were allowed to bring suit based on derivative harm, then it would be possible for both the corporation and the guarantor to sue, and for each to recover $100. The result would be that the person who harmed the corporation would have to pay $200 in damages where he only created $100 worth of harm. *Id*

Illinois law is less than clear on the issue,[4] most courts applying Illinois law have concluded that a guarantor suffers no direct harm by being called on to satisfy a guarantee where a lender or a third party's improper actions cause a company to default on a loan. *See Weissman v. Weener*, 12 F.3d 84, 87 (7th Cir. 1993); *Continental Bank v. Modansky*, 129 B.R. 159, 161 (N.D. Ill. 1991); *United Airlines v. ALG, Inc.*, 916 F. Supp. 793, 796 (N.D. Ill. 1996); *see also Mid-State*, 877 F.2d at 1336-37 (7th Cir. 1989) (considering a similar question under federal law). Indeed, most courts outside of Illinois have taken the same position when faced with the identical issue. *See, e.g., Labovitz v. Washington Times Corp.*, 172 F.3d 897 (D.C. Cir. 1999) (applying Delaware law).

There are two reasons for the rule that triggering payment on a guarantee by forcing a company into bankruptcy does not constitute direct harm to the guarantor. The first is obvious: it is the company itself that suffers the ultimate harm of being forced into bankruptcy. The guarantor suffers only derivatively. He is only injured to the extent that the company is first injured. Thus, the right to remedy the injury belongs to the company and, once the company recovers, it may also make the guarantor whole by paying back the amount of the guarantee. The second rationale stems from the guarantor's status as a contingent creditor. Once he has satisfied his guarantee, the guarantor becomes a creditor to the corporation and thus stands in the same shoes as all of the company's other creditors. In cases, such as this one, where the company is in the process of liquidating its assets, a guarantor may wish to bring a direct action so that he may jump ahead of all other creditors in the payment line. Such a result would be inequitable if the harm that he suffered is exactly the same as all other shareholders or creditors. If, on the other hand, a corporation itself sues to recover, the recovery may be shared by all creditors alike, including the guarantor. *Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 161 (1996).

---

[4] *See United Airlines v. ALG, Inc.*, 916 F. Supp. 793, 796 (N.D. Ill. 1996) (noting that Illinois law is ambiguous).

7

It is only where a guarantor can claim some sort of injury directed at him and not at the corporation that he may stand apart from other creditors and sue in an individual capacity. For example, if Ballantyne and Renzoni were to allege that Congress improperly coerced them into signing the guarantee in the first place, recovery might be possible because their decision to sign the guarantee was a personal one, involving their personal finances primarily and those of Texas Steel only indirectly.[5] *Mid-State*, 877 F.2d at 1336; *see also eOnline v. Chicago Consulting Partners*, No. 01-C-1918, 2002 WL 484865, at *6-7 (N.D. Ill. 2002) (allowing a plaintiff to sue where he alleged that the defendant fraudulently induced him to sign a guarantee). By contrast, Ballantyne and Renzoni's decision to have Texas Steel file for Chapter 11 protection was not at all personal. That decision, whether improperly coerced by Congress or not, was ultimately *Texas Steel's* decision, albeit made through Ballantyne and Renzoni in their capacities as controlling shareholders. Thus, it is Texas Steel that should be allowed to recover for any fraud, misrepresentation, or coercion that resulted in the decision, not Ballantyne and Renzoni. The same rationale applies to bar all of Ballantyne and Renzoni's other claims and affirmative defenses. With respect to each, Ballantyne and Renzoni allege that Congress improperly forced them to take actions that ultimately resulted in Texas Steel's bankruptcy and the request to enforce their guarantees on Texas Steel's loans. Yet all of the actions that Congress allegedly forced Ballantyne and Renzoni to take were done in their capacities as controlling shareholders of Texas Steel. Thus, the acts alleged were forced upon Texas Steel itself, and not upon Ballantyne and Renzoni as individuals. Because neither Ballantyne nor Renzoni allege that Congress improperly forced or coerced them to do anything in their personal capacities, they have not satisfied the real party in interest requirement of Rule 17(a).

---

[5] None of Ballantyne or Renzoni's allegations suggest that Congress acted improperly in obtaining the guarantee agreements. In fact, Ballantyne and Renzoni do not allege that Congress acted improperly at all until well after the guarantee agreements were signed.

8

Ballantyne and Renzoni nonetheless advance the novel theory that, where a lender takes control of a corporate debtor away from guarantors "such that the interests of those in control of the corporate debtor are no longer aligned with the interests of the guarantors, the guarantors have standing to pursue claims against those who have taken over the corporate debtor." (Opposition to Motion to Dismiss Counterclaims and Strike Affirmative Defenses at 2.) The rationale for this proposed exception seems to be that a guarantor must be empowered act to support his own interests where the corporation cannot be trusted to do so. Although this rationale might make sense in some situations, it does not here, where the corporation has filed for bankruptcy and thus where the interests of the corporation are now enforced by a trustee. There is no reason to fear that the trustee in this case will give preferential treatment to Congress or decline to pursue any valid claims that Texas Steel may have against Congress. For that reason, there is no basis for creating an exception to the direct injury requirement such as the one that Ballantyne and Renzoni propose.

Furthermore, Ballantyne and Renzoni are unable to support their proposed exception with any authority. Rather than citing to any case that specifically endorses their position, they cite only to Judge Ripple's concurrence in *Mid-State Fertilizer*, which stated:

> [T]here are situations - especially in the case of a closely held corporation - where the relationship between the corporation and the guarantor, combined with the conditions directly imposed by the bank on the guarantor, may require that the guarantor have standing to bring such actions. The majority opinion recognizes this possibility; it therefore would be a mistake for the bench and bar to overread today's holding as precluding all such actions.

877 F.2d 1333, 1340 (7th Cir. 1989). Although Judge Ripple does indeed leave a window open for guarantors to assert claims against lenders in some cases, he does not suggest when this exception might apply, nor has the Seventh Circuit or any Illinois court applied Judge Ripple's exception in a way that would support Ballantyne and Renzoni's argument.

9

We fail to see how Judge Ripple's concurrence, or any of the other allegations made by Ballantyne or Renzoni, puts them in a position different from any other creditor of Texas Steel.[6] All of the acts alleged against Congress in their affirmative defenses and counterclaims were directed at Texas Steel, not at Ballantyne and Renzoni. The ultimate harm alleged was done directly to Texas Steel; that the guarantees were thus triggered was only a collateral consequence of that ultimate harm. We thus find that Ballantyne and Renzoni have not alleged direct injury sufficient to satisfy Federal Rule of Civil Procedure 17(a)'s real party in interest requirement.[7]

## CONCLUSION

For the foregoing reasons, Congress' Motion to Dismiss and Motion to Strike is granted. Ballantyne and Renzoni are granted leave to amend only to the extent that they can allege direct harm

---

[6] In fact, the D.C. Circuit, when presented with a similar situation, declined to create an exception to the direct injury requirement based on Judge Ripple's language. In that case, the *Washington Times* had loaned money to a company called DCI. The plaintiffs, the Labovitzes, guaranteed the loan. *Labovitz v. Washington Times Corp.*, 172 F.3d 897 (D.C. Cir. 1999). Later, the *Washington Times* took control of DCI and forced it into bankruptcy, thereby triggering the Labovitzes' guarantee. The facts of that case are virtually identical to those alleged by Ballantyne and Renzoni here: in both cases, a company loaned money, the plaintiff guaranteed, then the lender took control of the debtor and forced the debtor into bankruptcy. In *Labovitz*, as here, the plaintiffs cited Ripple's *Mid-State* concurrence in arguing that they met the real party in interest requirement of Rule 17(a). The D.C. Circuit declined to adopt the Labovitzes' position, stating that the fact that DCI was controlled by their lender "still does not demonstrate how the Labovitzes have suffered a special injury apart from other creditors and guarantors. The fact that the *Times* may have required the Labovitzes to make good on their guarantees when DCI defaulted on its loan obligations is a duty imposed on every guarantor . . . Put otherwise, as contingent creditors, the Labovitzes fail to explain why their injury places them in a different position than every other creditor and guarantor owed money when DCI entered bankruptcy." *Id.* at 903.

[7] Because neither Ballantyne nor Renzoni are the real parties in interest with respect to any claim or affirmative defense that they assert, we need not address the other arguments that Congress presents in its motion to dismiss.

10

inflicted upon them by Congress in relation to their guarantees. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated 12/16/03